United States District Court
Southern District of Texas
**ENTERED**
December 16, 2021
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TUBULAR ROLLERS, LLC, *et al.*, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 4:19-CV-03113 |
| MAXIMUS OILFIELD PRODUCTS, LLC, *et al.*, | § § § § | |
| *Defendants*. | § § | |

## ORDER

Before the Court is Defendants' *Daubert* Motion to Exclude the Damages Opinions and Testimony of Darrell Harris. (Doc. No. 72). Plaintiffs have responded in opposition and Defendants have replied. (Doc. Nos. 80, 82). The Court grants in part and denies in part the Defendants' motion.

### I.

Defendants' motion was filed under the principles set in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). *Daubert*'s holdings have been summarized as follows:

> Reliable testimony must be grounded in the methods and procedures of science and signify something beyond "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. The inferences or assertions drawn by the expert must be derived by the scientific method. *Id.* In essence, the court must determine whether the expert's work product amounts to "'good science.'" *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II") (quoting *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786). In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. The Supreme Court emphasized the "flexible" nature of this inquiry. *Id.* at 594, 113 S.Ct. 2786. As later confirmed in *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999): "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination." *Id.* at 141–42, 119 S.Ct. 1167.

*Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011).

While *Daubert* attacks usually focus on a witness' reliability, some courts have also included an attack on a witness' qualification (or lack thereof) under the *Daubert* umbrella. Defendants' motion has the elements of both.

## II.

One of Defendants' primary complaints, however, does not fall under the rubric of *Daubert*. Defendants complain that Plaintiffs' expert, Darrell Harris ("Harris"), filed a supplemental report well after any applicable deadline and that the report expands the scope of and basis for his testimony. The timing of this supplemental report certainly provides some justification for Defendants' concerns. The deadline for expert reports in this case was March 5, 2021 and the deadline for rebuttal reports was April 2, 2021. Harris' initial report, dated March 4, 2021, was timely and Defendants do not object to it on those grounds. Harris was then deposed on April 19, 2021. That date was well after both expert report deadlines. Then, on June 30, 2021, Plaintiffs served Defendants with Harris' supplemental report, which was dated five days earlier. At the time no explanation was given for either the provision of the report some three months after the deadline nor for the fact that once finalized it was not immediately sent to opposing counsel.

Defendants' motion accurately describes the law with regard to the timing and sequencing of reports and the Court recounts it here. A court's scheduling order regarding disclosure of expert testimony governs the timing and sequence for the disclosure of expert reports. *See* Fed. R. Civ. P. 26(a)(2)(D); *Guffy v. Brown*, No. 15-3229, 2016 WL 7439431, at *1 (S.D. Tex. Dec. 27, 2016).

2

Rule 26(a) states that an expert's report must contain "(i) *a complete statement of all opinions* the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them," and "(iii) any exhibits that will be used to summarize or support them. . . ." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). A party's failure to provide timely expert disclosures under Rule 26 precludes the party from "us[ing] the information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Davis v. Davis*, No. 2:12-CV-166, 2017 WL 896299, at *4 (S.D. Tex. Mar. 7, 2017) (quoting Fed. R. Civ. P. 37(c)(1)).

Rule 26(e) only permits a party to supplement an expert report "to cure material errors or omissions." It is not designed to allow a party to avoid disclosure deadlines. *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, No. 1:15-CV-134-RP, 2017 WL 9480314, at *2 (W.D. Tex. May 22, 2017) ("Construing Rule 26(e) to allow a party to supplement its expert report with additional detail subsequent to the expert's deposition would undercut the purpose of Rule 26(a)(2)(B), which is intended to ensure initial expert reports are both 'detailed and complete.'"); *Akeva L.L.C. v. Mizuno Corp.*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would wreak havoc in docket control and amount to unlimited expert opinion preparation."); *Cochran v. Brinkmann Corp.*, No. 1:08- CV-1790-WSD, 2009 WL 4823858, at *5 (N.D. Ga. Dec. 9, 2009), *aff'd sub nom.* 381 F. App'x 968 (11th Cir. 2010) ("The purpose of expert reports and a deadline for serving them is to put an opposing party on notice of what it must contend with at trial."). The Fifth Circuit has recognized that supplemental disclosures "are not intended to provide an extension of the deadline by which a party must deliver the lion's share of its expert

3

information." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 571 (5th Cir. 1996).

Plaintiffs respond that Harris' supplemental report, albeit produced after the applicable deadlines, was filed for the purposes of "completeness" given that a certain amount of discovery had taken place in the meantime.

The Court has reviewed in detail Harris' initial and supplemental reports and finds that the supplement report follows the same format and reaches the same conclusions as the initial report. It does expand on the reasoning but, given the state of the case at the time, the Court does not find the expansion to be inappropriate. The motion to totally strike Harris' supplemental report is therefore denied.

Nevertheless, Defendants should not be prejudiced by this ruling. Therefore, Plaintiffs are ordered to make Harris available to Defendants for a second deposition not to exceed two hours and Defendants are hereby given leave for their financial expert to amend his/her report (solely to rebut the supplemental report) should they so desire, as long as the amendment is done within 45 days of this order.

Finally, this Court feels compelled to point out that expert reports are written to apprise the opposing side of an expert's opinion and are inadmissible hearsay. Therefore, absent an agreement by all parties, neither of Harris' reports nor any other expert's report will be allowed into evidence.

### III.

This holding is not to say that all of Harris' opinions are valid and/or admissible. Harris, in both his initial and supplemental reports, purports to analyze and then apply the factors set out in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). In that widely cited case, the court set out four factors to analyze to determine if a patent holder lost profits due

to alleged infringement. These factors are: 1) demand for the patented product; 2) absence of non-infringing substitutes; 3) the patent holder's manufacturing capacity and marketing capability to meet the demand; and 4) the amount of profit the patent holder would have made.

Defendants claim that Harris' approach to most of these factors is not only unreliable, but also a misapplication of *Panduit*. Harris, in his initial report, relied on the Fifth Circuit as authority to establish demand instead of conducting an analysis of the marketplace. *See Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549 (Fed. Cir. 1984). This is a combination of a bootstrapping and a Catch-22 rolled into one opinion. It is not solid expert analysis. Harris' opinion on demand is hereby stricken. In his supplemental report, Harris purports to additionally establish demand by a review of the parties' internal invoices and by rentals to ConocoPhillips. This basis was not attacked in the Defendants' motion. To the extent that Harris can reliably predict demand by looking at ongoing transactions, the Court will allow (absent other objections) such testimony. Testimony based upon a Fifth Circuit case and Plaintiffs' own unproven allegations, however, will not be allowed.

With regard to "acceptable non-infringing substitutes", Harris has no qualifications to offer any opinion. Harris is a Certified Public Accountant. While he has worked at and with companies in the oilfield business, he has not established that he has any expertise or specialized knowledge in pipe racks or tools designed to move pipe. Even in his supplemental report, he merely accepts as fact his conversations with James Wald and, not coincidently, rejected sworn statements by a Nabors employee which reach the opposite conclusion. Defendants have no expertise in the credibility of either individual or the tools or market in question. Therefore, the Court grants Defendants' motion with regard to Harris' testimony concerning prong two of the *Panduit* test. Additionally, Harris has exhibited no specialized knowledge as to Plaintiffs' manufacturing

capabilities or marketing expertise. Thus, Harris may not testify as to prong three of the *Panduit* test.[1]

As for the fourth prong ("lost profits"), Defendants complain that Harris makes assumptions or calculates certain figures without "showing the math." (Doc. No. 72 at 17). Defendants also complain that Harris applies a lost profits analysis, which they argue must be tied to the "number of infringing units sold." While not a misstatement of the general rule, this fact situation involves a comparison of the Tubular rentals versus Maximus' sales and/or Nabors' usage. The very nature of this fact situation compels one to compare apples to oranges. Nevertheless, Harris' approach is not inherently unreliable. Moreover, this Court has now granted judgment to Maximus. (Doc. No. 53). Therefore, the problem becomes all the more extenuated. The goal of the analysis (assuming liability) would be to determine the lost net rental profits that Tubular would have received but for Nabors' alleged infringing conduct.

The Court suggests that the Federal Circuit has recognized that damages can be awarded on an analysis of "lost rental profits." *See, e.g., Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 652–53 (Fed. Cir. 1985).

Defendants object, perhaps with some validity, about certain of Harris' assumptions. For example, Harris chose a period of 2.5 years. He does not analyze what tool (or what tool configuration) was used on each well. Additionally, Harris counted as offending rigs those on which the Plaintiffs' tools were actually onsite and for which Plaintiffs were being compensated. These assumptions, while undermining Harris' opinion, do not require the exclusion of his entire testimony.

---

[1] Obviously, in the formation of an opinion an individual expert may rely on the testimony of those who actually are qualified.

6

> This is the type of "[s]haky but admissible evidence" that must "be attacked by cross examination, contrary evidence and attention to the burden of proof, not exclusion."

*Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc.*, 87 F. Supp. 3d 928, 941 (N.D. Cal. 2015) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).

Finally, Defendants complain about Harris' "royalty assessment." Defendants complain that the rate used by Harris has no tie to any technology. In the instant case, Tubular does not license its technology. Harris does not point to any other entity that licenses "rolling tools," nor can he point to one license that has been entered into in the entire history of "rolling tools." Plaintiffs concede the problem. "Although some technologies may have common practice of licensing the technology from which to draw particularized conclusions about royalty rate, there is no such information available for rolling tools. . . ." (Doc. No. 80 at 14). Harris, in fact, notes that Tubular was not interested in licensing its technology nor was it willing to sell its tools.

Harris dutifully listed the fifteen *Georgia-Pacific* factors that guide most cases involving lost royalties. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). He then discards virtually all of the factors as being non-applicable to the facts of this case. He precedes this review by stating:

> Plaintiffs were not in the practice of licensing their tools to other parties, and I understand from conversations with Mr. Wald that they would not have been inclined to grant a license to Maximus. For that reason, it is my opinion that a lost profits analysis is the appropriate measure of damages.

(Doc. No. 80-1 at 7).

While this Court does not hold as a matter of law that the lost profits analysis is the only proper measure of damages, it finds, at least based upon the two reports before it and the facts of this case brought to light so far, an analysis centered on a hypothetical reasonable royalty negotiation lacks any reliability at all. Harris' royalty analysis is rife with speculation and

7

assumptions. While *Daubert* contemplates that experts must opine using their specialized training and experience, the starting point of their work must emanate from known facts. Here, there are no or at most very few facts upon which anyone can base a *Georgia-Pacific* analysis.

Plaintiffs in their briefing have emphasized to the Court that a *Daubert* analysis keys off three factors: "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000). Here, Harris may be qualified to make a lost royalty analysis, but given the lack of information there is very little by way of reliability, and there is certainly no "fit." The above-quoted statement from Harris' report admits as much. Consequently, in this area Harris gets an "A" for effort, but not an "A" for admissibility.

This Court has not seen or been asked to review any other economic/damages reports, but regardless of whose expert it is or what the report states, unless there is a showing to this Court that there exists some measure of reliability (that heretofore has not been shown), this Court will not entertain a damages analysis based upon the *Georgia-Pacific* model.[2]

SIGNED at Houston, Texas this 16th day of December, 2021.

Andrew S. Hanen
United States District Judge

---

[2] This Court has frequently tried cases where the economic testimony centered on the *Georgia-Pacific* factors. Often not all the factors are relevant and the omission of a few does not undermine the analysis. Here, however, one has no facts upon which to evaluate the vast majority of the factors. No amount of expertise can fill in the factual gaps and if the analysis boils down to speculation and guessing, the Court finds no need for an expert to help the jury guess.